SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**State v. Terrell M. Chambers** (A-35-21) (086317)

**Argued October 12, 2022 -- Decided January 23, 2023**

**FASCIALE, J., writing for the Court.**

In this case, the Court establishes the procedural and analytical framework applicable to a defendant's good-faith discovery request for pre-incident mental health records from a sexual assault victim, balancing the victim's highly confidential and privileged communications and the defendant's important right to present a meaningful defense.

The Court reviews in detail the underlying facts and evidence as presented in the record. Defendant Terrell M. Chambers was indicted and charged with second-degree sexual assault, N.J.S.A. 2C:14-2(c)(1), following a victim's allegation that he performed non-consensual oral sex upon her several times over the course of a night when they drank alcohol at a gathering with friends and family.

Defendant and several witnesses spoke about the victim's alleged pre-incident mental illness. Defendant stated that the victim "was in the psychiatric home before, she went crazy before," implying that she suffered from an illness that impaired her ability to recount the incident, or at a minimum, that she imagined or fabricated the incident. Defendant's sister stated that the victim "is suicidal" and that "something went wrong with background" when the victim wanted to become a law enforcement officer. The sister's boyfriend likewise stated that the victim "has been suicidal for a while" and could not become an officer because of "some suicidal things she had on her record."

Defense counsel filed a motion to compel the State to obtain and produce the victim's pre-incident mental health records. Alternatively, counsel requested that the State make such records available for an in camera inspection. The State opposed the motion and argued it was not in possession, custody, or control of the records, and that it was without knowledge of their existence.

The judge granted defendant's motion and ordered the State to obtain and produce, for an in camera inspection, the victim's mental health records -- extending six months before the incident and six months after the incident. The judge accepted

1

defense counsel's argument that "[t]he possibility of mistaken perception or recollection of an incident presents a legitimate need for the information which outweighs any possible prejudice." The victim had no notice of the motion and therefore had no opportunity to be heard.

The Appellate Division denied the State's emergent motion seeking leave to appeal and a stay, noting that the State could renew its motion after the judge "issues an order regarding the use of the victim's psychiatric records" following the in camera inspection. The Court granted leave to appeal. 249 N.J. 457 (2022).

**HELD:** A heightened discovery standard governs a defendant's motion for pre-incident mental health records from a sexual assault victim. The Court establishes the standard applicable to a formally filed motion and also outlines a less formal process through which defendants may make requests for discovery of the pre-incident mental health records of an alleged sexual assault victim by letter to the prosecutor's office. So that the new procedural and analytical framework can be applied in this case, the Court vacates the orders under review and remands the matter for further proceedings.

1. Under both the Federal and the New Jersey Constitutions, criminal defendants have the right to a meaningful opportunity to present a complete defense. To be able to present a complete defense, a defendant is entitled to broad, automatic pre-trial discovery in criminal cases in New Jersey, which is governed by our court rules. Among the categories of items that the State is obligated to produce to a criminal defendant are reports of "mental examinations . . . which are within the possession, custody or control of the prosecutor." R. 3:13-3(b)(1)(C). But mental health records of a sexual assault victim are not within the possession, custody, or control of the prosecutor, and defendant therefore has no right under the court rules to obtain such records from the State. Moreover, the State's disclosure obligations under Brady v. Maryland, 373 U.S. 83 (1963), do not extend to documents in a private third-party's possession. Nevertheless, courts can order discovery of mental health records of sexual assault victims by exercising their inherent power to order discovery when justice so requires. (pp. 19-22)

2. Beyond the statutory and constitutional rights granted to all crime victims, New Jersey law confers additional rights upon victims of sexual assaults. Among the rights accorded to sexual assault victims by the Sexual Assault Victim's Bill of Rights (SAVBR), N.J.S.A. 52:4B-60.2, (c)(1) to (c)(11), are rules regarding sexual assault victims' participation in investigatory proceedings, including that victims can "choose whether to participate in any investigation of the assault," id. at (c)(7); see also id. at (c)(4), (c)(6), and (c)(10). Alongside the SAVBR's explicit codification of a sexual assault victim's right to decline to participate in an investigation, New Jersey's sexual assault statute was amended in 2020 to make

2

clear that the only requirement for a conviction under the sexual assault statute is proof beyond a reasonable doubt that there was sexual penetration and that it was accomplished without the affirmative and freely given permission of the victim. Thus, in addition to the enactment of the SAVBR and other statutes designed to offer rights and protections specific to victims of sexual assault, amendments to the criminal statute have arguably made victims' mental health records less commonly necessary for a defense by eliminating older standards under which evidence of a victim's mental state was sometimes more relevant to culpability. (pp. 22-26)

3. The Court emphasizes that the rights of defendants and victims are not mutually exclusive. Judicial discovery standards have long recognized that the greater the intrusion into one's privacy, the higher the burden a defendant must show for the information sought. A majority of other state courts that have addressed the issue have concluded, upon balancing the rights of criminal defendants and alleged sexual assault victims, that there are certain circumstances under which review of mental health records is appropriate, and the Court reviews the standards established in such cases. (pp. 26-30)

4. The Court sets forth the procedural and analytical framework, under New Jersey law, for harmonizing the constitutional rights guaranteed to criminal defendants with the rights accorded to sexual assault victims in recognition of the potential trauma, embarrassment, and anxiety that might be caused by granting access to an alleged victim's mental health records. Under the Court's framework, a defendant is entitled to present a meaningful defense by making a good-faith request for pre-incident mental health records of a sexual assault victim. A defendant can make a motion seeking that information, follow a less formal path exploring access to the records, or both. The Court outlines each option in turn. (p. 30)

5. If a defendant files a motion seeking access to pre-incident mental health records, a victim is entitled to notice by the county prosecutor's office and must have an opportunity to be heard, with or without independent counsel. A sexual assault victim must receive notice of defendant's motion from an assistant prosecutor or a victim witness coordinator, not a defendant or defense counsel. The State and any alleged victims have the right to oppose the motion, and we leave to the discretion of a trial judge the appropriate briefing schedule. In addition to the notice requirement, a motion for discovery of mental health records must satisfy a two-stage standard. First, to obtain an in camera inspection of the alleged sexual assault victim's mental health records, a defendant must make three showings: (1) that there is a substantial, particularized need for such access; (2) that the information sought is relevant and material; and (3) that the information is not available through less intrusive means. If a defendant satisfies that three-part standard by a preponderance of the evidence, then the defendant is entitled to have a judge conduct an in camera inspection. The court shall enter an order directing disclosure of the records under the appropriate

3

circumstances. The Court rejects defendant's contention that defense counsel should be allowed to be present during the in camera review. During the in camera inspection, the judge must determine whether to "pierce" the applicable mental health privilege, redact the pre-incident records, and make them available under a protective order. The Court reviews in detail the standard for making that determination under N.J.R.E. 534 and provides guidance about the redaction and discovery of such records. (pp. 31-36)

6. If a defendant chooses to proceed informally, a victim is still entitled to notice by the county prosecutor's office and must have an opportunity to be heard with or without independent counsel. Like the formal route, informal requests for mental health records should be rare. To proceed informally, defense counsel can in good faith seek pre-incident mental health records by sending a letter to an assistant prosecutor. The letter should (1) identify with particularity the kinds of records sought; (2) show substantial need tied directly to the victim's ability to perceive, recall, or recount the facts of the alleged incident, or to the victim's likelihood to fabricate or even imagine the incident altogether; and (3) explicitly state that sexual assault victims have a statutory right not to "participate in any investigation of the assault." The Court establishes additional requirements and notes that defendants have discretion to determine whether to proceed formally or informally. (pp. 37-38)

7. In light of the new procedural and analytical framework adopted in this opinion, the Court vacates the trial court's orders and remands for further proceedings. The Court reviews the record and concludes that there must be something more than what is currently before the Court to establish substantial need for access to the mental health records of a sexual assault victim. The Court provides guidance for the remand and notes that the defense team can supplement the record. (pp. 38-41)

**The orders under review are VACATED and the matter is REMANDED.**

**CHIEF JUSTICE RABNER; JUSTICES PATTERSON, SOLOMON, and PIERRE-LOUIS; and JUDGE SABATINO (temporarily assigned) join in JUSTICE FASCIALE's opinion.**

SUPREME COURT OF NEW JERSEY
A-35 September Term 2021
086317

State of New Jersey,

Plaintiff-Appellant,

v.

Terrell M. Chambers,

Defendant-Respondent.

On appeal from the Superior Court,
Appellate Division.

Argued
October 12, 2022

Decided
January 23, 2023

Frank J. Ducoat, Special Deputy Attorney General/Acting
Assistant Prosecutor, argued the cause for appellant
(Theodore N. Stephens, II, Acting Essex County
Prosecutor, attorney; Caroline C. Galda, Special Deputy
Attorney General/Acting Assistant Prosecutor, of counsel
and on the briefs, and Frank J. Ducoat, on the briefs).

Alexandra E. Macaluso argued the cause for respondent
(Fusco & Macaluso, attorneys; Alexandra E. Macaluso
and Giovanna Giampa, on the briefs).

Lila B. Leonard, Deputy Attorney General, argued the
cause for amicus curiae Attorney General of New Jersey
(Matthew J. Platkin, Attorney General, attorney; Lila B.
Leonard, of counsel and on the brief).

1

Alyssa Aiello, Assistant Deputy Public Defender, argued the cause for amicus curiae Public Defender of New Jersey (Joseph E. Krakora, Public Defender, attorney; Alyssa Aiello and Rachel A. Neckes, Legal Fellow, on the brief).

Aidan P. O'Connor argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey (Pashman Stein Walder Hayden, attorneys; Aidan P. O'Connor, on the brief).

Alexander Shalom argued the cause for amicus curiae American Civil Liberties Union of New Jersey (American Civil Liberties Union of New Jersey Foundation and Rutgers Constitutional Rights Clinic Center for Law & Justice, attorneys; Alexander Shalom and Jeanne LoCicero, of counsel and on the brief, and Ronald K. Chen, on the brief).

JUSTICE FASCIALE delivered the opinion of the Court.

In this case, we establish the procedural and analytical framework applicable to a defendant's good-faith discovery request for pre-incident mental health records from a sexual assault victim. The parties and amici agree generally that under certain circumstances, such records might be discoverable. And they acknowledge that an accused and a sexual assault victim each have important constitutional, statutory, and common law rights. But they disagree how to harmonize those discordant rights.

We do not expect that defendants will routinely make requests for mental health records of sexual assault victims. Such requests are and should

2

remain rare.  Here, defendant knew the victim and believed she suffered from a pre-incident mental illness that impaired her ability to accurately recall the alleged incident.  This appeal requires that we balance a sexual assault victim's highly confidential and privileged communications and a defendant's important right to present a meaningful defense.

We hold that a heightened discovery standard governs a defendant's motion for pre-incident mental health records from a sexual assault victim.  First, to be entitled to an in camera inspection of those records, a defendant must preliminarily demonstrate by a preponderance of the evidence, (1) a substantial, particularized need for the records; (2) that the alleged mental illness is both relevant and material to a victim's ability to perceive, recall, or recount the alleged assault, or a proclivity to imagine or fabricate it; and (3) that the information sought cannot be obtained through less intrusive means.  Second, if a defendant satisfies that heavy preliminary burden after appropriate notice to the victim as we later describe, the judge must conduct an in camera inspection and determine whether to "pierce" the privilege, redact the records, and produce them under a protective order.  In addition to that standard applicable to a formally filed motion, we outline a less formal process through which defendants may make requests for discovery of the pre-incident mental

health records of an alleged sexual assault victim by letter to the prosecutor's office.

Because we are announcing a new procedural and analytical framework applicable to a defendant's request for such records, we vacate the order directing the State to produce the victim's purported records; we vacate the order denying the State's motion for reconsideration; and we remand for the parties to supplement the record and for further proceedings consistent with this opinion.

## I.

### A.

The case comes to us in the early discovery stage. The trial record contains police and forensic reports, as well as statements from various individuals. We summarize the pretrial factual allegations that the judge considered, understanding that the State will be left to its proofs at trial. The alleged incident occurred at the residence of defendant Terrell Chambers's sister (the sister).[1] Defendant and the victim are cousins, and defendant, the victim, and the witnesses were well acquainted.

---

[1] We do not utilize names of family members or friends to protect their privacy. We refer to the alleged victim as "the victim." See R. 1:38-3(c)(12).

The victim and the sister are in their early thirties. Although they had been very close since childhood, the sister stated that she and the victim were "kinda . . . separated" at the time of the alleged offense because of some recent "family drama." Defendant was twenty-seven years old and training to be a police officer. According to defendant and his sister, the victim allegedly previously pursued a similar career interest in law enforcement.

In the late afternoon on Saturday, October 13, 2018, multiple people gathered at the sister's home. Those in attendance included the victim and her nine-year-old daughter; the sister's boyfriend and his children; the sister's infant daughter; defendant; defendant's girlfriend; and defendant's friend. The sister, who was breastfeeding her infant child, consumed no alcohol that night. The victim and defendant stayed at the residence overnight because they were inebriated. Their own statements to detectives reflect that they spent the night in the sister's living room, either on the same couch or on different but nearby couches.

The victim alleges that she woke up to defendant performing cunnilingus on her. She pushed him away but was unable to get up because of her state of inebriation. According to the victim, defendant repeated the sexual assault approximately three more times that night. Each time he allegedly did so she protested by pushing him away.

5

A few days later, the victim contacted her best friend (the best friend), who was not there the night of the alleged assault. The victim texted her the following message:

> A few nights ago, I was raped by a relative. I'm [f*****] up right now and have no one else to talk to about this. . . . I just spoke with you about giving up the other day and it's getting real for me right now. I can't really talk about it to anyone, but, if something were to happen to me, I need someone to know the facts on why anything happened. Why the [f***] [has] this [s***] happened to me. I have lost all faith in God because this is beyond making me a stronger person. I am broken right now[,] and I am now in a very dark place. I hate my life right now. Why has this happened to me, why? That night continues to play in my head. I want it to go away. Since then, I've been crying. Not a clue what to do. I do not want to tell my family. I do not know what to do. I love you so much, I really do. I'm sorry for pulling you into this, but, I need for someone to know.

The best friend immediately called her. Six days after the incident, the victim sat down with her parents, her sister, her brother, a family friend who worked in law enforcement, and the best friend, and explained to them what allegedly happened during the evening in question. They encouraged her to report the incident to the police, and the next day the victim gave a statement to the Prosecutor's Office. At that time, she produced for forensic testing the underwear she wore that night.

Approximately two days later, the victim participated in a consensual intercept telephone call, arranged by detectives, between her and defendant. On the call, the victim asked defendant, "Yo, Sunday, why'd you do what you did, yo?" Defendant asked, "[w]hat'd I do Sunday?" then told her he would call her right back. Defendant then sent a text message saying, "I'm confused. When I park, I'll call back." Fifteen minutes later, he texted her saying, "I'm at the uniform place getting fitted for my bulletproof vest." The victim responded by saying, "just step out and give me a minute because I need an apology from you and why you did it."

When defendant called her back, she asked him, "you literally sat there and [performed cunnilingus], . . . why would you do that?" Defendant said, "I was blacked out, I don't even remember . . . too much." He continued denying any wrongdoing saying he did not "even remember how [he] got home" because he "was blacked out, blacked out, blacked out." He said, "I'm sorry, I swear to God, I apologize -- I'm apologizing to you, if I did, I'm so sorry." Defendant told the victim, "honestly, I don't even remember." He eventually stated, "I'm apologizing . . . I'll kill myself right now . . . do you want me to kill myself, I will do it . . . I know you hate me, you'll never have to see me again, I promise." He added, "I was blacked out." In response to her repeated questions about whether defendant performed oral sex on her, defendant

7

finally responded "yeah . . . I answered you, yes." After defendant's admission, the victim asked if he was sorry, and defendant then stated, "Yes, I feel like s*** . . . I believe I'm going to kill myself. I can't live my life like this. I'm going to have to do it because I can't live my life like this." Defendant went on to say, "I don't need to be alive anymore. I f***** up." Defendant begged the victim not to tell the sister, and to give him some time so that he could tell the sister himself.

The police then took statements from defendant, the sister, and the sister's boyfriend. In their statements, they all vaguely alluded to the victim's alleged mental health history. The sister also told the police that she learned from defendant's girlfriend about the victim's alleged failure to become a police officer due to the victim's alleged mental illness. We summarize the statements from these three individuals, especially their references to the victim's alleged mental illness.

First, the detectives interviewed defendant the day after the recorded phone call between him and the victim. Defendant admitted that he attended the gathering and remained at the sister's residence after a night of drinking alcohol. He explained that he stayed on a different couch, also in the living room, than the one on which the victim slept. He said the victim "passed out

before me" and most importantly, he denied sexually assaulting her, saying "[t]his is ridiculous."

The detectives questioned defendant about whether the victim asked for an apology during the intercepted call. Defendant admitted that he consumed alcohol the morning of the call, and "that's the part where it gets fuzzy for me . . . I know . . . we . . . talk[ed] . . . it's hazy [be]cause I was drinking and I'm saying to myself . . . what's going on here." He explained "I know I was really, really, really drunk, I know that for a fact. . . . I was [a] messy stumbling drunk. I could barely walk myself." Defendant added, "[i]t didn't happen. That's a fact, that didn't happen. . . . [She]'s lying." He conceded that he told the victim on the recorded phone call that he performed oral sex on her but then explained to the detectives that he lied because he was scared. Defendant told the detectives "that's the only mistake I made by saying I did something I didn't [do]."

Defendant then referred to his understanding about the victim's alleged pre-incident mental illness. In response to the detectives questioning him about why she would lie, defendant responded vaguely, "I don't know, but, she was in the psychiatric home before, she went crazy before . . . something happened to her . . . [and] they evaluated her . . . a few years ago." The implication was that she suffered from an illness that impaired her ability to

9

recount the incident, or at a minimum, that she imagined or fabricated the incident. Defendant offered no further details, and the detectives asked no follow-up questions.

Second, detectives interviewed the sister about two weeks after the incident. She said the victim was "completely drunk" and "intoxicated from marijuana." She stated the victim "couldn't even . . . keep her eyes open" and had "passed out on the couch." The sister believed defendant had slept for only 1.5 to 2 hours. The sister reports that she was generally aware of what happened during the night because she "didn't get any sleep" and was "up all night." Between 1:00 a.m. and 8:00 a.m., the sister stated she was "back and forth" between her bedroom, living room, and kitchen caring for her newborn and trying to reach her boyfriend by text and phone calls. The sister explained that from her bedroom, she could see everything in the living room because her bedroom light and kitchen light stayed on for the duration of the night. She added that every time she came out of her bedroom and turned the hallway lights on, defendant was "alert that [she] was walking through the house" because he told her to turn the lights off.

The sister stated that her boyfriend returned for ten minutes around 3:15 a.m. According to the sister, defendant awakened and was Facetiming and speaking on the phone with a woman from around 3:45 a.m. to 5:15 a.m.

10

According to the sister, defendant had fallen asleep around 6:00 a.m. after he had been "on the phone the entire time." During his phone call with the woman, the sister saw the victim "buried into my couch, knocked out."

The sister explained, "that's why I [am] completely confused, like, where did the [sexual assault] happen because I was up. I was a sober adult, up, with my child in my arms and I had a room full of kids . . . . You can hear everything[,] . . . [m]y apartment isn't . . . so big, you can hear a pin drop at night." The sister stated that the victim wore jeans and she "was buried under [a] blanket . . . [and] pillows, . . . her pants were still on -- she fell asleep with her . . . Uggs[,] . . . . She never took anything off." She added, "if [defendant was] standing over her, trying to [assault] her with her pants and her panties down, I would've heard something."

The sister explained that at 6:30 a.m., when some of the children woke up, she saw the victim "still in the spot" on the couch. The sister stated that the victim "didn't move. She was stuck in that one spot" on the couch and "[a]sleep the entire time" until 8:00 a.m. The sister stated that everyone left her residence by 8:45 a.m.

The sister told detectives that she then spoke to the victim about unrelated topics around 12:00 p.m. and 2:00 p.m. The sister also stated that "I do know that [the victim] was passed out cause the next day I text her, like,

you and [defendant], you guys were done and she was, like, LOL, and, then she sent me pictures of my daughter that afternoon" and responded with emojis to some of her "Instasnap[s]." According to the sister, everyone was "normal" in the days following the alleged incident. She spoke to the victim on the phone on Saturday, October 20, and the victim told her about a car accident that occurred the previous day. The sister first learned about the sexual assault allegations when her brother, defendant, returned home from police questioning on the night of Monday, October 22.

On the subject of the victim's prior history of an alleged mental illness, the sister explained to detectives that defendant's girlfriend had told her that the victim "wanted to be a cop, but, something went wrong with background." Applying her own personal knowledge, the sister added, "[w]hat I do know is that [the victim] is suicidal[,] . . . in my family, they have these jealousy things . . . if someone's happy, she got a suicidal post up, if someone's getting engaged, she got a post up" on social media.

Third, detectives interviewed the sister's boyfriend on Thursday, October 25. He confirmed that everyone had been drinking that night except for the sister. He added that in addition to the alcohol, the victim smoked marijuana that night. He explained that he left around 1:00 a.m. after he and the sister had an argument. At the time he exited the sister's residence, he saw

12

the victim consoling defendant while defendant cried on the victim's shoulder after the sister and her boyfriend argued. The sister's boyfriend departed the residence and continued texting the sister throughout the early morning hours.

The sister's boyfriend stated that at 3:15 a.m. he returned to the home and saw defendant and the victim sleeping. He then walked out of the residence five minutes later. During the brief time he was there, the lights were off, and the sister was awake walking from her room to the kitchen with the baby. Everyone else "was knocked out . . . fully clothed." He knew that the sister had "never [gone] to sleep" because the couple continued texting "throughout the night." He returned at 8:00 a.m. and saw the victim and defendant still asleep and fully clothed.

As to the victim's alleged mental health state, the sister's boyfriend told detectives that "this girl has been suicidal for a while . . . [i]f you dig, you will see it." He stated that "everybody knows [she] gets suicidal" and she posts on Facebook about it. The sister's boyfriend explained that the victim was unable to be a police officer because of "some suicidal things she had on her record." He speculated about the victim's "motive behind this" but provided no further details.

13

A grand jury indicted and charged defendant with second-degree sexual assault, N.J.S.A. 2C:14-2(c)(1).  A saliva sample was collected from the victim's underwear.  The State then confirmed, after the indictment, that the saliva matched defendant's DNA.

Defense counsel filed a motion to compel the State to obtain and produce the victim's pre-incident mental health records.  Alternatively, counsel requested that the State make such records available for an in camera inspection.  The State opposed the motion and argued it was not in possession, custody, or control of the records, and that it was without knowledge of their existence.

The judge granted defendant's motion and ordered the State to obtain and produce, for an in camera inspection, the victim's mental health records -- extending six months before the incident and six months after the incident.[2] The judge agreed that if the victim had a mental health illness and had been taking medication, the combination of the medicine and alcohol could have impacted how the victim perceived, recalled, and related the incident.  The

---

[2]  The parties agree that on this trial record there is no articulated basis to inspect records of mental health consultation or treatment that took place after the incident.

14

judge accepted defense counsel's argument that "[t]he possibility of mistaken perception or recollection of an incident presents a legitimate need for the information which outweighs any possible prejudice."

To explain how defendant's DNA was found on the victim's underwear, defense counsel argued to the judge that the victim's alleged mental illness "could have motivated" her to wipe defendant's DNA from where he had cried on her shoulder earlier and place it on her underwear that night, implying that the victim framed defendant, or in the alternative, that she imagined or otherwise fabricated the allegation that he assaulted her. The victim had no notice of the motion and therefore had no opportunity to be heard.

The State moved for reconsideration. In denying that motion, the judge determined that there was a "preponderance of the evidence that [mental health records] exist[ed]." The judge reiterated defendant satisfied his discovery burden to show "the minimal threshold of demonstrating that the[] [mental health] records may contain exculpatory information as well as information related to the identification and credibility of witnesses." The judge again directed the State to obtain the records.

The State moved for leave to appeal and stay the judge's discovery orders. The Appellate Division denied the State's emergent motion, noting

15

that the State could renew its motion after the judge "issues an order regarding the use of the victim's psychiatric records" following the in camera inspection.

We granted leave to appeal. 249 N.J. 457 (2022). We also granted the motions of the Attorney General, the Office of the Public Defender (OPD), the Association of Criminal Defense Lawyers of New Jersey (ACDL), and the American Civil Liberties Union of New Jersey (ACLU) to appear as amici curiae.

## II.

On appeal, the assistant prosecutor was unable to say whether the victim received any mental health treatment or whether mental health records exist, and he confirmed that he did not speak to the victim about the subject.[3] The State concedes generally that pre-incident mental health records may be discoverable under certain circumstances but emphasizes that the type of information -- mental health records -- and the status of the person whose records are sought -- victims of sexual assault -- require a heightened

---

[3] The assistant prosecutor represented to this Court that he is unsure whether police academy records exist pertaining to the victim's alleged mental health history. On remand, the State should make the appropriate inquiries and establish whether such information exists. If it does, the judge should then determine, on notice to the victim, whether those records are discoverable.

16

discovery standard.  The State proposes that a defendant should have the burden, on notice to the victim who should have an opportunity to be heard, to make a substantial showing that there is a particularized need for such discovery and that the mental health information sought cannot be obtained by less intrusive means.  The State suggests that a judge should then consider the privacy interests of the sexual assault victim and whether the records will reveal material exculpatory evidence.

The Attorney General, appearing as amicus curiae, generally agrees that pre-incident mental health records of a sexual assault victim may be discoverable.  The Attorney General adopts the State's request for a heightened standard.  According to the Attorney General, anything less would deter sexual assault victims from reporting crimes or seeking treatment and might encourage defense counsel to routinely request mental health records out of a perceived fear that doing otherwise would be ineffective assistance of counsel.

Defendant acknowledges that a victim has the right to notice and an opportunity to be heard.  But he rejects application of a heightened standard for disclosure of a victim's mental health records in sexual assault cases and instead proposes a lower standard to justify in camera review.  He asserts that a defendant must show something less than a particularized need but more than

17

a generalized assumption or possibility that a mental illness would impact a material part of the case, specifically an ability to perceive, recall, or recount an event, or a proclivity to imagine or fabricate it. In other words, defendant contends there must be a reasonable suspicion of a mental illness and that it directly relates only to the ability to relate what allegedly occurred.

Amicus ACDL argues that when a defendant requests discovery that is outside the scope of our court rules, as happened here, defendant bears the burden of showing need. The ACDL proposes that a defendant must show the importance of the information sought and whether it can be obtained from other sources and must address how intrusive the disclosure would be on the victim.

Amici ACLU and OPD urge us to employ a multi-stage approach in determining whether to disclose privileged mental health records. Both amici agree that the reasonable probability standard is appropriate, but the ACLU emphasizes that reasonable probability, like reasonable suspicion, demands specifics and cannot rely exclusively on generalized assertions. Thus, although the OPD would have in camera inspection occur prior to a determination of materiality, the ACLU asserts defendants must first make a sufficient showing of reasonable probability. Once that is accomplished, the ACLU asserts, the judge should review the records in camera. The ACLU

18

contends that the State should then obtain the records by having the victim sign a release through, for example, a victim coordinator in the county prosecutor's office.

## III.

We begin by summarizing the rights of an accused and of victims of sexual assaults. Doing so places in context our conclusion that the information sought is governed by a heightened and multi-stage discovery standard.

## A.

Criminal defendants have the constitutional right to a fair trial, which includes the right to effective assistance of counsel, confrontation, compulsory process, and due process. U.S. Const. amends. V, VI; N.J. Const. art. I, ¶ 10. Under both the Federal and the New Jersey Constitutions, criminal defendants also have the right to "a meaningful opportunity to present a complete defense." State v. Budis, 125 N.J. 519, 531 (1991) (quoting Crane v. Kentucky, 476 U.S. 683, 690 (1986)). That opportunity includes seeking discovery that is relevant and material to a victim's ability to perceive, recall, or recount an alleged sexual assault, or a proclivity to imagine or fabricate it. See id. at 545 (noting that even when this Court has ultimately denied a defendant's discovery request, it has acknowledged that "[o]ur criminal justice system recognizes fully a defendant's right to prepare a defense and have

complete discovery") (O'Hern, J., dissenting) (quoting State v. R.W., 104 N.J. 14, 28 (1986))).

To be able to present a complete defense, a defendant is entitled to broad, automatic pre-trial discovery in criminal cases in New Jersey, which is governed by our court rules. See State v. Scoles, 214 N.J. 236, 252 (2013); R. 3:13-3(b). Our state's robust "'open-file approach to pretrial discovery in criminal matters' is intended '[t]o advance the goal of providing fair and just criminal trials.'" State v. Hernandez, 225 N.J. 451, 461-62 (2016) (alteration in original) (quoting Scoles, 214 N.J. at 252). This Court has emphasized that "[a] criminal trial where the defendant does not have 'access to the raw materials integral to the building of an effective defense' is fundamentally unfair." State in Int. of A.B., 219 N.J. 542, 556 (2014) (quoting Ake v. Oklahoma, 470 U.S. 68, 77 (1985)). Among the categories of items that the State is obligated to produce to a criminal defendant are reports of "mental examinations . . . which are within the possession, custody or control of the prosecutor." R. 3:13-3(b)(1)(C).

But mental health records of a sexual assault victim are not within the possession, custody, or control of the prosecutor, and defendant therefore has no right under the court rules to obtain such records from the State. See, e.g., State v. Kane, 449 N.J. Super. 119, 133 (App. Div. 2017) ("[E]vidence in the

20

control of a crime victim -- notwithstanding the victim's close cooperation with the prosecution -- is not within the prosecutor's 'possession, custody or control.'" (alteration in original) (quoting State v. Robertson, 438 N.J. Super. 47, 69 (App. Div. 2014))). Moreover, the State's disclosure obligations under Brady v. Maryland, 373 U.S. 83 (1963), do not extend to documents in a private third-party's possession. See, e.g., Robertson, 438 N.J. Super. at 69. Therefore, Rule 3:13-3(b) and Brady impose no independent discovery obligation on the State to obtain and produce the records.

Beyond court rules, however, the parties and amici recognize that courts can order discovery of mental health records of sexual assault victims by exercising their "inherent power to order discovery . . . 'when justice so requires.'" State v. Szemple, 247 N.J. 82, 97 (2021) (quoting State v. Marshall, 148 N.J. 89, 269 (1997)). Indeed, that inherent power provides the legal authority for an accused to make the request, subject to a discovery standard that balances a defendant's right with the protections afforded to sexual assault victims. "Whether discovery should be expanded [beyond Rule 3:13-3(b)] involves exercising judicial discretion . . . [by] balancing the beneficial effects of discovery against its disadvantages." State in Int. of W.C., 85 N.J. 218, 224 (1981).

21

Having considered the importance of discovery to a defendant's constitutional rights, we turn next to the rights of sexual assault victims that must also be weighed in determining whether the interests of justice require discovery beyond that afforded by court rule.

B.

New Jersey law has "reveal[ed] a steady movement . . . to recognize and enhance the rights of crime victims." State v. Tedesco, 214 N.J. 177, 196 (2013). It has done so by statute, case law, and amendment to our State Constitution.

In general, and under the Crime Victim's Bill of Rights (CVBR), N.J.S.A. 52:4B-34 to -38, "crime victims and witnesses are entitled to" several important rights. Those include being "treated with dignity and compassion by the criminal justice system," N.J.S.A. 52:4B-36(a); remaining "free from intimidation, harassment or abuse by any person including the defendant" or someone acting on the defendant's behalf, id. at (c); "hav[ing] inconveniences associated with participation in the criminal justice process minimized to the fullest extent possible," id. at (d); receiving information "about the criminal justice process" in general, the progress of the case in which the victim is involved, and available medical assistance and remedies, id. at (b), (f), (g), (h),

and (k); and having the opportunity to be present at and participate in proceedings as permitted by the State Constitution, id. at (p) and (r).

Under the relevant portion of the Victims' Rights Amendment (VRA) to the New Jersey Constitution, adopted in 1991,

> [a] victim of a crime shall be treated with fairness, compassion and respect by the criminal justice system. A victim of a crime shall not be denied the right to be present at public judicial proceedings except when, prior to completing testimony as a witness, the victim is properly sequestered in accordance with law or the Rules Governing the Courts of the State of New Jersey. A victim of a crime shall be entitled to those rights and remedies as may be provided by the Legislature.
>
> [N.J. Const. art. I, ¶ 22.]

Beyond those rights granted to all crime victims, New Jersey law confers additional rights upon victims of sexual assaults. Our courts have recognized that, in sexual assault cases, "the wellbeing of . . . victims demands heightened protection" because there is a "likelihood of emotional trauma and mental distress." State v. D.R.H., 127 N.J. 249, 259 (1992); see also State v. Ramirez, 252 N.J. 277, 299, 301-03 (2022) (detailing the substantial legislatively established rights for sexual assault victims); N.J.R.E. 517 (applying a victim-counselor privilege to crimes of violence including sexual assault). The Legislature distinguished victims of sexual assault from other crime victims

when it enacted the Sexual Assault Victim's Bill of Rights (SAVBR), N.J.S.A. 52:4B-60.2, which was passed unanimously by both houses in March 2019.

The statute notes other legislation that has conferred rights upon crime victims, id. at (a), and stresses that the SAVBR was intended to create "no diminution of [those] legislatively-recognized rights," id. at (c). The SAVBR then accords to victims of sexual assault a series of rights, see id. at (c)(1) to (c)(11), explaining that "victims of sexual violence in particular often face circumstances where they may be blamed for the crime, assumed to be fabricating the crime, or taken less seriously than their injuries warrant," id. at (b). In addition to provisions that guarantee various forms of medical and mental health services to victims of sexual assault, see id. at (c)(4), (c)(5), (c)(8), and (c)(9); and that provide standards of conduct toward and protections for sexual assault victims, id. at (c)(1) to (c)(3), and (c)(11); the SAVBR establishes rules regarding sexual assault victims' participation in investigatory proceedings, including that victims can "choose whether to participate in any investigation of the assault," id. at (c)(7); see also id. at (c)(4), (c)(6), and (c)(10).

Alongside the SAVBR's explicit codification of a sexual assault victim's right to decline to participate in an investigation, New Jersey's sexual assault statute -- N.J.S.A. 2C:14-2, under which defendant was indicted -- was

24

amended in 2020 to make clear "that the only requirement for a conviction under the sexual assault statute is proof beyond a reasonable doubt that there was sexual penetration and that it was accomplished without the affirmative and freely-given permission of the victim." C.R. v. M.T., 248 N.J. 428, 444 (2021) (quoting S. Law & Pub. Safety Comm. Statement to A. 2767 (Sept. 27, 2018)). That change reflected this Court's holding that

> neither the alleged victim's subjective state of mind nor the reasonableness of the alleged victim's actions can be deemed relevant to the offense. The alleged victim may be questioned about what he or she did or said only to determine whether the defendant was reasonable in believing that affirmative permission had been freely given. To repeat, the law places no burden on the alleged victim to have expressed non-consent or to have denied permission, and no inquiry is made into what he or she thought or desired or why he or she did not resist or protest.
>
> [Id. at 443 (quoting State in Int. of M.T.S., 129 N.J. 422, 448 (1992)).]

Thus, in addition to the enactment of the SAVBR and other statutes designed to offer rights and protections specific to victims of sexual assault, amendments to the criminal statute have arguably made victims' mental health records less commonly necessary for a defense by eliminating older standards under which evidence of a victim's mental state was sometimes more relevant to culpability. Our holding here relates solely to discovery and does not

25

disturb the current state of the law as it relates to a victim's mental state in the context of culpability.

All of those concepts are relevant considerations to balance against a defendant's constitutional rights and entitlement to discovery in support of those rights.

C.

Although a request for additional discovery requires that the rights of defendants and victims be balanced, we emphasize that those rights are not mutually exclusive. The rights of one need not be sacrificed for the rights of another. A.B., 219 N.J. at 558; see also State v. J.D., 211 N.J. 344, 357-58 (2012) (recognizing that a balance must be struck between competing interests in considering a request to present evidence of a victim's past sexual conduct notwithstanding the limits placed on such evidence by the Rape Shield Law, N.J.S.A. 2C:14-7). As the Supreme Court of Arizona has observed,

> [a] victim does not have an absolute privilege against disclosure of private records, nor does a defendant have an unqualified right to obtain those records for use at trial in every circumstance. Consequently, the rights of the defendant and victims are not necessarily mutually exclusive. In exercising its discretion, a court must strike a balance between the competing interests of a victim's privilege and a defendant's federal constitutional rights to procure and present evidence necessary to construct a complete defense. Thus, a victim's right to refuse discovery must yield when a

26

defendant makes the requisite constitutional showing of need for the information.

[Crime Victims v. Thompson, 485 P.3d 1068, 1075 (Ariz. 2021).]

We understand that a victim's constitutional right to be treated with "fairness, compassion and respect by the criminal justice system," N.J. Const. art I, ¶ 22, was not meant "to deny or infringe upon the constitutional rights of any person accused of a crime," A.B., 219 N.J. at 558 (quoting A. Comm. Statement to A. Concurrent Res. No. 85, 204th Leg., 1st Sess. 2 (1990)).  A witness has the right "[t]o be free from intimidation, harassment or abuse by any person including the defendant or [his attorney]."  N.J.S.A. 52:4B-36(c). But, as the parties here recognize, a victim's rights under the VRA, SAVBR, and CVBR "do not diminish those rights possessed by [an] accused facing a criminal prosecution."  A.B., 219 N.J. at 558.

Although we have not previously explored how the rights of a defendant and an alleged victim of sexual assault should be balanced as to requests for mental health records, our judicial discovery standards have long recognized that the greater the intrusion into one's privacy, the higher the burden a defendant must show for the information sought.  For example, a heightened standard of substantial need is imposed when a defendant requests an alleged victim undergo a psychiatric or gynecological examination because psychiatric

27

and physical examinations are extraordinary intrusions into an alleged victim's mind and body.  See D.R.H., 127 N.J. at 258-59; R.W., 104 N.J. at 28 & n.3; see also A.B., 219 N.J. at 562 (applying a heightened standard when a defendant requests a second inspection of a victim's home); State v. Perry, 225 N.J. 222, 236 (2016) (explaining the two-step analysis for determining the admissibility of evidence of a victim's prior sexual conduct); Kinsella v. Kinsella, 150 N.J. 276, 299 (1997) (adopting in the context of a request for psychiatric records a three-part test under which, for in camera review of the requested records to take place in a matrimonial case, "(1) there must be a legitimate need for the evidence; (2) the evidence must be relevant and material to the issue before the court; and (3) by a fair preponderance of the evidence, the party must show that the information cannot be secured from any less intrusive source" (emphases added) (citing In re Kozlov, 79 N.J. 232, 243-44 (1979))).

A majority of other state courts that have addressed the issue have concluded, upon balancing the rights of criminal defendants and alleged sexual assault victims, that there are certain circumstances under which review of mental health records is appropriate.  See Commonwealth v. Barroso, 122 S.W.3d 554, 561 (Ky. 2003) ("A majority of the state courts that have addressed the issue have held that a criminal defendant, upon a preliminary

28

showing that the records likely contain exculpatory evidence, is entitled to some form of pretrial discovery of a prosecution witness's mental health treatment records that would otherwise be subject to an 'absolute' privilege.").

Several courts have adopted a two-part approach, setting an initial standard for obtaining in camera review of a victim's mental health records and a more stringent standard for granting disclosure of what was found in the records to the defense. See, e.g., People v. Stanaway, 521 N.W.2d 557, 574-75 (Mich. 1994) (holding that (1) "on a showing that the defendant has a good-faith belief, grounded on some demonstrable fact, that there is a reasonable probability that the records are likely to contain material information necessary to the defense," a trial court may conduct an in camera review; and (2) "[o]nly after the court has conducted the in camera inspection and is satisfied that the records reveal evidence necessary to the defense is the evidence to be supplied to defense counsel"); Thompson, 485 P.3d at 1076-78 (holding that courts should "allow in-camera review of privileged [mental health] records when the defendant demonstrates a reasonable possibility that the requested information includes evidence to which he is entitled as a matter of due process" and noting that the more stringent "substantial probability standard" announced by the intermediate appellate court in that case "seem[ed] better suited to a disclosure rule rather than as a benchmark for in-camera review"); see also

29

State v. Storlazzi, 464 A.2d 829, 832-33 (Conn. 1983) (finding that "an in camera inspection by the trial judge of the witness' [mental health records] for material relevant to the issue of credibility is appropriate" but leaving the subsequent decision about granting a defendant access to the records to "be determined on a case by case basis" (quotation omitted)).

IV.

Guided by the principles set forth above, we next establish the procedural and analytical framework, under New Jersey law, for harmonizing the constitutional rights guaranteed to criminal defendants with the rights accorded to sexual assault victims in recognition of the potential trauma, embarrassment, and anxiety that might be caused by granting access to an alleged victim's mental health records.

Under the framework we adopt, a defendant is entitled to present a meaningful defense by making a good-faith request for pre-incident mental health records of a sexual assault victim. A defendant can make a motion seeking that information, follow a less formal path exploring access to the records, or both. We outline each option in turn, beginning with the more formal motion procedure.

30

A.

If a defendant files a motion seeking access to pre-incident mental health records, a victim is entitled to notice by the county prosecutor's office and must have an opportunity to be heard, with or without independent counsel. Under the CVBR, crime victims have the right "[t]o be informed about the criminal justice process," N.J.S.A. 52:4B-36(b); "[t]o be informed about available remedies," id. at (h); and "[t]o be advised of case progress," id. at (k). Additionally, crime victims have the right "to confer with the prosecutor's representative so that the victim may be kept adequately informed." Ibid. Considering the rights to communication that N.J.S.A. 52:4B-36 creates vis-à-vis the prosecutor's office, a sexual assault victim must receive notice of defendant's motion from an assistant prosecutor or a victim witness coordinator, not a defendant or defense counsel. The State and any alleged victims have the right to oppose the motion, and we leave to the discretion of a trial judge the appropriate briefing schedule.

In addition to the notice requirement, a motion for discovery of mental health records must satisfy a two-stage standard.

1.

First, to obtain an in camera inspection of the alleged sexual assault victim's mental health records, a defendant must make three showings: (1)

31

that there is a substantial, particularized need for such access; (2) that the information sought is relevant and material; and (3) that the information is not available through less intrusive means.

To establish a substantial, particularized need for access to mental health records, there must be some evidential showing that connects the alleged mental illness to the victim's inability to perceive, recall, or recount the events of the alleged assault, or a proclivity to imagine or fabricate them -- the sole permissible purpose for which access may be granted. A generalized statement that a victim is "crazy" is insufficient to establish the need for the records; there must be some persuasive evidential showing to establish substantial need. Seeking such records in the hopes of impeaching a victim with inconsistent statements will never justify access. Under certain circumstances, experts in the applicable field might establish the relationship between the alleged mental illness and a victim's inability to perceive, recall, or recount the events of the alleged assault (or as defendant suggests here, a mental condition that causes a victim to fabricate or imagine events). In other words, a persuasive evidential showing to establish substantial need may, under certain scenarios, include opinions from mental health experts.

Turning to the requirement that the information sought be not only relevant, but also material, we note that evidence is relevant if it has "a

32

tendency in reason to prove or disprove any fact of consequence to the determination of the action." N.J.R.E. 401. "[T]he 'probative value' of evidence is determined by 'its tendency to establish the proposition that it is offered to prove.'" State v. Perry, 225 N.J. 222, 237 (2016) (quoting State v. Garron, 177 N.J. 147, 167 n.2 (2003)). To be relevant, the alleged mental illness of a sexual assault victim must have a "tendency in reason to prove or disprove" an ability to perceive, recall, or recount the alleged assault, or a proclivity to imagine or fabricate it.

Materiality, in turn, "looks to the relation between the propositions that the evidence is offered to prove and the issues in the case." State v. Williams, 240 N.J. 225, 236 (2019) (quoting 1 McCormick on Evidence § 185, at 994 (7th ed. 2013)). "A material fact is one which is really in issue in the case." State v. Buckley, 216 N.J. 249, 261 (2013) (quoting State v. Hutchins, 241 N.J. Super. 353, 359 (App. Div. 1990)). Just as a victim's general ability to perceive, recall, or recount an alleged assault may be relevant evidence of a victim's alleged mental illness, it may be material to the limited extent that it calls into question the accuracy of a victim's version of events or, more fundamentally, whether the events that a victim alleges even took place.

The final showing that a defendant must make to prompt a court to review a victim's mental health records in camera is that the information sought cannot be obtained through less intrusive means.

2.

If a defendant satisfies the three-part discovery standard detailed above by a preponderance of the evidence, then the defendant is entitled to have a judge conduct an in camera inspection. The court shall enter an order directing disclosure of the records under the appropriate circumstances. We reject defendant's contention that defense counsel should be allowed to be present during the in camera review.

During the in camera inspection, the judge must determine whether to "pierce" the applicable mental health privilege, redact the pre-incident records, and make them available under a protective order. We review here the standard for making that determination.

N.J.R.E. 534 addresses the mental health service provider-patient privilege. In this case, the evidentiary rule would govern communication occurring before the alleged sexual assault. Under subsection (b), "[a] patient has a privilege to refuse to disclose in a proceeding, and to prevent any other person from disclosing confidential communications, as defined in [N.J.R.E. 534](a)(1)]." But disclosure is permitted by waiver or when the "exercise of

the privilege would violate a constitutional right." N.J.R.E. 534(g). Defendant has such a constitutional right to present a meaningful defense to the charges by making a good-faith request for pre-incident mental health records.

To "pierce" the mental health service provider-patient privilege, when a defendant seeks access to pre-incident mental health records from a victim of a sexual assault, the judge must balance a victim's protections afforded under the CVBR, VRA, SAVBR, and N.J.R.E. 534 against a defendant's constitutional right to present a meaningful defense. If a defendant proceeds to this point in the process, that defendant has already made a preliminary showing of substantial need for the information, that it is purportedly relevant and material, and that it cannot be obtained through less intrusive means. To "pierce" the privilege, the only thing left for the judge to do is identify whether there exists information in the records that pertains to a victim's ability to perceive, recall, or recount the alleged assault, or, as defense counsel represented at oral argument, that relates to whether the victim imagined or fabricated the incident.[4]

---

[4] Although defendant here is not seeking post-incident mental health records, if they exist -- where the victim may have, for example, sought counseling about the alleged sexual assault -- we note that under N.J.R.E. 517, the "victim counselor privilege" would apply to such a request. As to acts of violence -- which include sexual assault, see N.J.R.E. 517(b)(a); N.J.S.A. 52:4B-11(b)(9) -

35

If the judge concludes that the N.J.R.E. 534 privilege should be appropriately "pierced," then the judge must redact any non-relevant and non-material information from the records. That is, the judge must redact any information in the records that does not have a "tendency in reason to prove or disprove" a victim's ability to perceive, recall, or recount the alleged assault, or that the victim otherwise imagined or fabricated the incident. Any other communication shall not be disclosed.

Once the judge determines that the records, as redacted, are discoverable under the framework established here, then, solely for discovery purposes, the records should be produced under a protective order to be approved by the judge, with an opportunity for interlocutory appellate review before disclosure occurs.[5]

_____

- the Legislature declared that "it is the public policy of this State to extend a testimonial privilege encompassing the contents of communications with a victim counselor and to render immune from discovery or legal process the records of these communications maintained by the counselor." N.J.R.E. 517(a)(e).

[5] Admissibility into evidence is not before us since the primary focus at this point is pre-trial access.

B.

From a practical perspective, a defendant can forego formal motion practice and in good faith seek access to pre-incident mental health records of a victim of a sexual assault. The informal route, which would be without a motion, could expedite resolution of the request and avoid expense. If a defendant chooses to proceed informally, a victim is still entitled to notice by the county prosecutor's office and must have an opportunity to be heard with or without independent counsel. Like the formal route, informal requests for mental health records should be rare.

To proceed informally, defense counsel can in good faith seek pre-incident mental health records by sending a letter to an assistant prosecutor. The letter should (1) identify with particularity the kinds of records sought;[6] (2) show substantial need tied directly to the victim's ability to perceive, recall, or recount the facts of the alleged incident, or to the victim's likelihood to fabricate or even imagine the incident altogether; and (3) explicitly state that sexual assault victims have a statutory right not to "participate in any investigation of the assault."

---

[6] We do not expect the letter to identify the institution where or doctor from whom a victim received treatment.

A victim would receive notice of the letter from the county prosecutor's office, likely from a victim-witness coordinator, who must say to a victim, "You are under no obligation to tell us whether you received treatment and may respond with no comment, or you may explicitly choose not to respond." If a victim chooses to participate by acknowledging that pre-incident treatment occurred, and wishes to voluntarily make available the records, then the victim could sign appropriate releases to allow access.

Again, we leave a defendant with discretion to determine which route to take. We reiterate that we discourage routine requests in all cases, and that we expect such requests will be rare.

V.

Turning to the request made in this case, we note that appellate review of a trial court's discovery order is ordinarily for abuse of discretion. A.B., 219 N.J. at 554. An abuse of discretion occurs by making decisions "without a rational explanation, [that] inexplicably departed from established policies, or [that] rested on an impermissible basis." Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002) (quoting Achacoso-Sanchez v. INS, 779 F.2d 1260, 1265 (7th Cir. 1985)).

Here, however, it is unfair to focus on whether the judge abused her discretion because we have since chosen to "exercise [our] constitutional

authority over the practices and procedures of our courts . . . to ensure greater fairness in the administration of justice." Orientale v. Jennings, 239 N.J. 569, 592 (2019) (discussing the powers conferred by N.J. Const. art. VI, § 2, ¶ 3). We do so by establishing a new procedural and analytical framework applicable to a defendant's request for a victim's pre-incident mental health records. In short, we hold here that a heightened discovery standard governs a defendant's motion -- of which the victim must receive notice from the prosecutor's office -- for pre-incident mental health records from a sexual assault victim.

We therefore vacate the trial court's orders and remand for further proceedings to be guided by the procedural and analytical framework set forth in this opinion. We offer the following guidance based on the record in this case to date.

Here, defendant, the sister, the sister's boyfriend, and, indirectly, defendant's girlfriend, made general references to the victim's mental health history, such as her alleged "suicidal ideations." Defendant divulged to detectives that the victim was "in [a] psychiatric home before, she went crazy before . . . something happened to her . . . [and] they evaluated her . . . a few years ago." The sister's boyfriend told detectives the victim "has been suicidal for a while . . . if you dig, you will see it." There must be something more

39

than what is currently in the record before us to establish substantial need for access to the mental health records of a sexual assault victim.

Defendant seemingly suggests that the victim's purported pre-incident mental health condition may have caused her to imagine or fabricate the alleged incident. Defendant asserts she wiped his DNA from where he had cried on her shoulder and placed it on her underwear. To establish substantial need under that circumstance, he must do more than make a bald assertion: defendant must make an evidential showing that her pre-incident mental health condition is connected to her inability to perceive, recall, or recount the events of the alleged assault, or to a proclivity to imagine or fabricate the alleged assault. No connection was presented to the judge.

On remand, the defense team can supplement the record to establish the requisite substantial, particularized need by connecting the victim's purported mental illness to her inability to perceive, recall, or recount the events of the alleged assault, or her proclivity to imagine or fabricate them, or by developing more specific evidence of pre-incident mental illness. We do not expect a defendant to identify the precise institution or mental health provider, but for a defendant to preliminarily satisfy the heightened discovery standard, more is required than an assertion, like defendant's, that "something happened to [the victim]" and that "[the victim] went crazy before."

40

As to the final showing to obtain in camera review, we cannot determine on the sparse record before us whether there are less intrusive means for assessing the victim's ability to perceive, recall, or recount the alleged assault, or proclivity to imagine or fabricate the alleged assault, other than through inspection of the victim's pre-incident mental health records. Towards that end, the defense team can probe more about whether family members and friends have additional knowledge of the victim's alleged mental illness. Further, as the witness statements reflect, the defense might be able to utilize the victim's text messages or social media postings as a less intrusive means.

## VI.

For the reasons set forth above, the orders under review are vacated, and the matter is remanded for further proceedings consistent with this opinion.

CHIEF JUSTICE RABNER; JUSTICES PATTERSON, SOLOMON, and PIERRE-LOUIS; and JUDGE SABATINO (temporarily assigned) join in JUSTICE FASCIALE's opinion.

41